UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CELIA E. MURPHY,
     Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration,
     Defendant.

CIVIL ACTION NO.
11-10634-JLT

**REPORT AND RECOMMENDATION RE:**
**PLAINTIFF'S BRIEF IN SUPPORT OF AN ORDER REVERSING OR REMANDING**
**THE DECISION OF THE COMMISSIONER (DOCKET ENTRY # 13); DEFENDANT'S**
**MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER**
**(DOCKET ENTRY # 15)**

**April 10, 2012**

**BOWLER, U.S.M.J.**

Pending before this court are cross motions by the parties, plaintiff Celia E. Murphy ("plaintiff") and defendant Michael J. Astrue, Commissioner of the Social Security Administration ("Commissioner"). Plaintiff seeks to reverse or remand the decision of the Commissioner pursuant to 42 U.S.C. § 405(g). (Docket Entry # 13).[1] (Docket Entry # 15). The Commissioner seeks an order affirming the denial of benefits to plaintiff under 42 U.S.C. § 405(g). This court held a hearing on January 31, 2012, and took the motions (Docket Entry ## 13 & 15) under advisement.

---

[1] Although not captioned as a motion, the brief requests a reversal of the Commissioner's decision. This court therefore construes the filing as a motion.

PROCEDURAL HISTORY

On August 17, 2009, plaintiff filed an application for
Social Security Disability Insurance ("SSDI") benefits and
Supplemental Security Income ("SSI") benefits with the Social
Security Administration ("SSA") alleging disability since May 1,
2009. (Tr. 169-170, 173-179). Specifically, plaintiff alleged
an inability to work due to bipolar disorder, post-traumatic
stress disorder ("PTSD"), anxiety, manic depression and sleep
problems. (Tr. 169-170, 173-179, 192). The Commissioner denied
the application by letter dated October 22, 2009. (Tr. 106-109).
Plaintiff then filed a request for reconsideration, which was
denied by letter dated February 18, 2010. (Tr. 120-122). On
March 4, 2010, plaintiff submitted a request for a hearing before
an administrative law judge ("ALJ"). (Tr. 124-125). On
September 20, 2010, the ALJ conducted the hearing. On October
29, 2010, the ALJ issued a decision denying plaintiff's claim.
(Tr. 36-49).

In the decision, the ALJ found that plaintiff had severe
impairments[2] but that the impairments did not meet or medically
equal one of the listed impairments in 20 C.F.R. Part 404,

_____

[2]  The ALJ found that plaintiff "had the following severe
impairments:  polysubstance abuse in variable remission; bipolar
disorder; major depressive disorder, recurrent, moderate; post-
traumatic stress disorder, anxiety disorder, NOS (not otherwise
specified); attention deficit disorder; avoidant personality
disorder; borderline personality disorder and tremors."  (Tr. 41-
42).

Subpart P, Appendix 1.  The ALJ also found that plaintiff had the residual functional capacity ("RFC") to perform work other than plaintiff's past relevant work.  (Tr. 43-49).  The ALJ thus concluded that plaintiff was not disabled under the Social Security Act.  (Tr. 39-49).  The Decision Review Board ("DRB") selected plaintiff's claim for review, so the ALJ's decision did not become final immediately.  (Tr. 36).  On February 8, 2011, however, the ALJ's decision became the final determination of the SSA after the DRB failed to complete its review within the 90 day period required by 20 C.F.R. § 405.420(a)(2).  (Tr. 1-3).

On April 14, 2011, plaintiff filed the complaint requesting a reversal of the Commissioner's decision or, in the alternative, a remand pursuant to 42 U.S.C. § 405(g).  (Docket Entry # 1).  Plaintiff argues that the ALJ's decision was not supported by substantial evidence.  (Docket Entry # 14).


FACTUAL BACKGROUND

I.  Plaintiff's Medical History

Plaintiff was born on August 4, 1979.  She alleges that her disabling condition began on May 1, 2009, when she was 29 years old.  (Tr. 192).  Plaintiff did not graduate from high school but later obtained her GED[3] and completed three years of college.  (Tr. 44, 198).  Her relevant past work consists of experience as

---

[3]  GED is an acronym for general equivalency diploma.

a general clerk and a personal care attendant.  (Tr. 48).
Plaintiff has never married and has no children.  (Tr. 315).

The record establishes that plaintiff suffered from
emotional and mental health issues for a number of years.
Plaintiff's medical history consists of several incidents of
hospitalization for suicidal ideations, the first of which
occurred when she was 12 years old.  (Tr. 357-366).  Plaintiff
reports having been sexually abused by her stepfather throughout
her childhood.  (Tr. 686, 692).  Plaintiff's medical history also
includes polysubstance abuse in variable remission.  (Tr. 901).
Her medications have included Clonazepam for anxiety, Celexa for
depression, lithium carbonate for bipolar disorder and methadone
for heroin withdrawals.  (Tr. 232).  Plaintiff's treating
psychiatrist, Richard Pillard, M.D. ("Dr. Pillard") prescribed
these medications and saw plaintiff a number of times in 2009.
(Tr. 426-456).

In particular, on September 3, 2009, Dr. Pillard noted that
plaintiff "came into the office in a state of overwhelming
anxiety.  Her feet were dancing, her hands trembling."  (Tr.
455).  On October 8, 2009, he noted that she came "looking as
anxious as before with dancing legs, anxiety and depression
written all over her body."  (Tr. 450).

The Disability Determination Services ("DDS") referred
plaintiff for a psychiatric consultative examination with Harry

4

Senger, M.D. ("Dr. Senger"), which occurred on October 15, 2009.
(Tr. 308). Plaintiff told Dr. Senger that she lost her job in
April 2009 because she was "too depressed to get out of bed . . .
[t]hat happens a lot." (Tr. 308). Additionally, plaintiff
reported that "she has been psychiatrically hospitalized about 9
times (the last time two years ago) - always for depressed mood
with suicidality." (Tr. 308). Plaintiff also told Dr. Senger
that she experienced manic moods occasionally but that her usual
mental state was depressed. (Tr. 308). She further informed Dr.
Senger that she had "no history of hallucinations or delusions or
significant alcohol or substance abuse." (Tr. 308). Dr. Senger
noted that plaintiff's legs jittered up and down markedly
throughout the entire session; that she spoke in a low, strained
voice which was barely audible; and that she had poor eye
contact. (Tr. 310).

Plaintiff scored 29/30 on the Mini-Mental Status Examination
and Dr. Senger assessed her GAF score at 52.[4] (Tr. 310). Dr.
Senger also noted that plaintiff could "subtract 7 from 10, but
not correctly 7 from 100. When asked to count backward from 100
by 1s, she is able to complete this longer but easier task, all

---

[4] The GAF scale is used for psychologically evaluating a
person's level of functioning. GAF stands for global assessment
of functioning. See Ross v. Astrue, 2011 WL 2110217, at *3 n.2
(D.Mass. May 26, 2011) ("GAF scores in the 51-60 range indicate
'[m]oderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) or moderate difficulty in
social, occupational, or school functioning (e.g., few friends,
conflicts with peers or coworkers)'").

the way down to 0; but is very slow, and makes a half dozen errors." (Tr. 315). Dr. Senger diagnosed plaintiff with "bipolar II disorder, depress[ion], PTSD and avoidant personality disorder." (Tr. 310).

On November 12, 2009, Dr. Pillard noted that plaintiff was "little if any better than when I first saw her." (Tr. 446). He also noted that, "She still shakes with anxiety, her voice is tremulous, she spends her days reading in the library and is fearful of any change in her routine . . .." (Tr. 446). On December 10, 2009, Dr. Pillard noted that her depression was about the same and her legs trembled. (Tr. 441-442).

Plaintiff again saw Dr. Pillard on December 31, 2009. (Tr. 426, 483). Dr. Pillard noted that plaintiff appeared fatigued, but was otherwise calm, rational and alert with a GAF score of 51. (Tr. 426, 483). Dr. Pillard also noted that "this session was devoted to completing a lengthy report to Mr. Noa, the attorney for [plaintiff's] disability application." (Tr. 426, 483).[5]

On January 21, 2010, plaintiff presented in an out of control manner at Boston Medical Center's emergency room after drinking alcohol and using cocaine. (Tr. 476-483). On February 18, 2010, Patricia Flanagan, a nurse practitioner at Boston

---

[5]  This "lengthy report" is what plaintiff contends is the undated Psychiatric Review Technique Form ("PRTF") with the illegible signature. (Tr. 571-584).

Medical Center, noted that plaintiff was alert, in no acute
distress, oriented to three spheres and had appropriate affect
and mood, normal interaction and good eye contact.  (Tr. 557).
On March 24, 2010, plaintiff was admitted to the Arbour Fuller
Hospital's Dual Diagnosis Unit because she could not control her
substance abuse and suffered from hallucinations.  (Tr. 632 &
643).  Upon admission, plaintiff's affect was labile and
flattened, her thoughts were racing and she had limited judgment,
insight and attention span.  She was also experiencing anxiety,
depression, suicidal and paranoid ideation, obsessions,
compulsions and auditory hallucinations.  (Tr. 646-647).

On April 13, 2010, plaintiff was discharged from Arbour
Fuller Hospital with a bright affect, oriented to the future and
without suicidal ideation or hallucinations although she had an
anxious mood as evidenced by tangential speech.  (Tr. 843).  On
June 9, 2010, plaintiff saw an advanced practice registered nurse
at Boston Medical Center, Kathleen Fuentes ("Fuentes"), who noted
that plaintiff's presentation remained the same and that her
extremities still had a tremor.  (Tr. 881).

On June 15, 2010, plaintiff saw her primary care physician,
Laura Wung, M.D. ("Dr. Wung"), who noted that plaintiff was alert
and made good eye contact but had poor insight and was rocking
from side to side in her chair throughout the appointment.  (Tr.
903).  Dr. Wung also noted that plaintiff had been picking at her

skin with tweezers, causing some bleeding. (Tr. 903).

Additionally, Dr. Wung noted that plaintiff asked Dr. Wung

whether she could wash her hands at which point plaintiff

"proceeded to scrub arms vigorously from upper arms downward for

about 5 minutes." (Tr. 903). Dr. Wung reported that "despite

multiple medications, patient still displays psychomotor

agitation, poor insight, some OCD behaviors." (Tr. 904). On

July 7, 2010, Fuentes saw plaintiff and noted that she presented

with a rocking motion and chronically picked at her skin. (Tr.

876).


II. <u>SSA Hearing</u>

Plaintiff appeared and testified at the hearing before the

ALJ on September 20, 2010. (Tr. 39). At the hearing, the ALJ

also heard testimony from Ulrich Jacobsohn, M.D.[6] ("Dr.

Jacobsohn"), an impartial medical expert, and James D. Sarno

("Sarno"), a vocational expert. (Tr. 39). In the opening

statement, plaintiff's attorney noted for the record that

plaintiff's "knees are moving. She's fidgeting, and that is

something that I think our medical expert needs to understand in

terms of her physical capacity for maintaining concentration and

persistence in pace in any kind of a work atmosphere." (Tr. 55).

---

[6] In the transcript of the hearing before the ALJ, Dr. Jacobsohn
is referred to as Dr. Jacobsen and once as Dr. Jacobson. (Tr.
74).

The ALJ likewise noted for the record that since plaintiff
entered the hearing room, "there has been nonstop rocking
backwards and forward in her chair and from side to side.  She
has a very distressed look on her face.  She's sometimes pulling
at her hair and is grimacing and looks very anxious and unhappy."
(Tr. 55).

A.  Plaintiff's Testimony

After a few introductory questions, the ALJ began asking
plaintiff about her alcohol and substance abuse.  (Tr. 58).  The
ALJ asked plaintiff about her methadone treatment.  Plaintiff
testified that she is supposed to go to a clinic to get her daily
dosage of 45 milligrams of methadone but that sometimes she
cannot go because the bus is crowded.  (Tr. 61).  Plaintiff
testified that she sometimes forgets to take some of the
medications that doctors have prescribed for her, especially in
the afternoon, "because I'm not very good at remembering in the
afternoon."  (Tr. 64).

The ALJ additionally questioned plaintiff about her past
relevant work.  Plaintiff testified that her job at Le Cordon
Bleu as an administrative assistant ended because there were
"[t]oo many people, and it's crowded.  And I'd be late because if
the train was too crowded, I just wanted to go, and it takes a
long time to wait for an uncrowded one."  (Tr. 68).  When the ALJ
questioned plaintiff about other anxiety triggers in addition to

9

crowds, plaintiff responded that elevators and revolving doors were problematic.  (Tr. 69).

Upon further questioning by her attorney, plaintiff explained what she had earlier described as "tapping."  (Tr. 70). When asked about the tapping, plaintiff explained that she tapped her feet and her fingers, turned the water on and off, turned the doorknobs and put her clothes out only in the morning.  (Tr. 70). Plaintiff elucidated that when she walks on the sidewalk she feels a compulsion to do certain things before a specific car passes her and she has to start over if she does not finish her ritual in time.  (Tr. 70).  When her attorney asked her about the frequency of the tapping, plaintiff testified that if she goes into the bathroom, she has to wash her hands, open and shut the shower curtain and be out before the toilet flushes or else she has to go back in and do it again.  Plaintiff testified that she does this every day.  (Tr. 71).

When asked about sleeping issues, plaintiff testified that she sleeps better than she used to but she still has nightmares. (Tr. 73).  She also admitted that she takes medication for sleep but sometimes when she knows she is going to have a nightmare she does not take it.  (Tr. 73).

When her attorney asked plaintiff if she had any difficulty taking care of herself, including showering and getting dressed, plaintiff responded that she did, explaining that when she

experiences depression she does not take showers sometimes for a couple of weeks. (Tr. 73). Plaintiff mentioned that she is afraid to shower when she is alone and is afraid to shower in the public shelter because there are too many people. (Tr. 73-74).

B. Medical Expert's Testimony

When plaintiff finished testifying, the ALJ questioned Dr. Jacobsohn, who testified by telephone without video feed. (Tr. 52 & 55). The ALJ reported to Dr. Jacobsohn that plaintiff, throughout her presentation at the hearing, had been "rocking back and forth and sometimes waving her hands around and has a distressed look on her face." (Tr. 74). The ALJ asked Dr. Jacobsohn about plaintiff's medically determinable impairments. (Tr. 75). In response, he elaborated:

> Well, what is striking is the report of age 15 with a diagnosis clearly documented of bipolar disorder, which seems to be sort of the foundation of all of her difficulties . . . [s]he's had through the years multiple other diagnoses most prominently anxiety disorder, but also [PTSD], but I do think that the primary illness appears to be a mood disturbance that is significant and requires medication, which she is currently getting.

(Tr. 75-76).

In response to the ALJ's question as to whether plaintiff met any listing, Dr. Jacobsohn testified that plaintiff met the criteria for Listing 12.04,[7] affective disorders, and possibly the criteria for Listing 12.06,[8] anxiety disorders. (Tr. 83).

_____

[7]  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04.
[8]  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06.

With respect to Listing 12.04, Dr. Jacobsohn relied on a 30 page,
March 2010 report prepared by Jocelyn Lahaye, M.D. ("Dr.
Lahaye"), a physician at Arbour Fuller Hospital.  (Tr. 788-817).
The report indicated that plaintiff suffered from:

> sleep disturbance, psychomotor agitation, feelings of guilt
> or worthlessness, difficulty concentrat[ing] or thinking
> and talk of suicide for the depressive symptoms.  For manic
> symptoms, hyperactivity, flight of ideas, decreased need
> for sleep, easy distractability, involvement in activity
> that results in high caliber yet painful consequences.

(Tr. 83-84).  On April 2, 2010, Arbour Fuller Hospital's records
show plaintiff's GAF score at 30.  (Tr. 787).

The ALJ then brought up exhibit 12F (Tr. 483-486) in which
Dr. Pillard noted that plaintiff was fatigued but otherwise calm,
rational and alert with a GAF score of 51.  (Tr. 88).  The ALJ
opined that "because there were such changes in presentation it
looked like substance abuse was a material factor."  (Tr. 88).
Then, the ALJ asked Dr. Jacobsohn whether in this record we have
"seen differences in presentation by [plaintiff]."  (Tr. 90).
Dr. Jacobsohn's response was, "I've got it right in front of me.
She has continuing tremors."  (Tr. 90).  The ALJ then said,
"Okay, so I just have a question.  Based on your review of the
medical records, does [plaintiff] have a difference in
presentation at different visits?"  (Tr. 90).  Dr. Jacobsohn
responded, "Not that I can see."  (Tr. 90).  The ALJ then asked
whether plaintiff presented the same way with Dr. Pillard as she
did in visits with other providers.  Dr. Jacobsohn replied,

"Well, that's a complex question, and I cannot glean from my review of whether that is indeed the case." (Tr. 89).

The ALJ then stated:

Well, Dr. Pillard says she's not overly anxious, but other people say she's anxious, right? Okay, you know, I'm really not trying to argue with you. I'm just trying to find the basis of your opinion, but it seems like this is taking a really long time, and we have another hearing waiting, so I think I'm just going to kind of wrap up with your opinion, doctor, and I'll just kind of take everything into account . . ..

(Tr. 89-90). Subsequently, Dr. Jacobsohn opined that plaintiff "presents of [sic] a dysfunctional person each and every time with some changes in actual presentation, but, generally, as a dysfunctional person . . .." (Tr. 92). After plaintiff's attorney had a brief opportunity to examine Dr. Jacobsohn, the ALJ interrupted, "And we have to move on to the VE testimony because we have another hearing. Your client arrived quite late, and we tried to fit you in." (Tr. 93).

C. Vocational Expert's Testimony

The ALJ proceeded to the testimony of Sarno, the vocational expert. (Tr. 94-99). Sarno testified that plaintiff would be unable to return to any of her past relevant work. (Tr. 96). The ALJ thereafter presented Sarno with a hypothetical question to which Sarno testified there were three jobs that an individual described in the hypothetical could do.[9] (Tr. 96-97). Those

_____

[9] The hypothetical question was as follows:

Hypothetical individual number one is limited to unskilled

13

three jobs were a laundry aid, light cleaning and a vehicle
cleaner.  (Tr. 97).  Then, the ALJ modified the hypothetical by
adding the condition that the individual, "because of intrusions
of anxiety and other mental health issues, would be off task at
least ten percent of each workday at least on average" in
addition to normal breaks and lunch.  (Tr. 97).  Sarno responded
that this would be "problematic in terms of a full-time job."
(Tr. 97).

Plaintiff's attorney then modified the ALJ's first
hypothetical question with the assumption that the individual
would have difficulty commuting to and from work because of her
anxiety and fear of crowds and this would make her attendance
unreliable on a regular, consistent basis.  (Tr. 98).
Plaintiff's attorney asked Sarno whether that modification would
mean that the individual would be able to keep any of the three
jobs mentioned.  Sarno testified that the individual would not be
employable if that were the case.  (Tr. 98).

---

        work with simple repetitive tasks, only rare changes in the
        work setting, only rare judgment or decision making, jobs
        involving no interaction with the general public, only
        occasional superficial interaction with coworkers.  This
        individual cannot be in crowds and would not be required to
        be in enclosed spaces such as elevators, would be limited
        to jobs that do not require fine fingering . . . [a]re
        there other jobs that this individual could do?

(Tr. 96).

I.  Jurisdiction and Standard of Review

Plaintiff seeks review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  The statute states in pertinent part that, "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days."  42 U.S.C. § 405(g).  The court has the power to enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Id.

The ALJ's findings of fact are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Manso-Pizarro v. Secretary of Health and Human Services, 76 F.3d 15, 16 (1st Cir. 1996); see also Atralis Condominium Ass'n v. Secretary of Housing and Urban Development, 620 F.3d 62, 66 (1st Cir. 2010) ("ALJ's factual findings are binding as long as they are supported by substantial evidence in the record as a whole").  The court must therefore determine "whether the final decision is supported by substantial evidence and whether the correct legal standard was used."  Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001);

<u>Geoffroy v. Secretary of Health and Human Services</u>, 663 F.2d 315, 319 (1st Cir. 1981).

Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." <u>Rodriquez v. Secretary of Health and Human Services</u>, 647 F.2d 218, 222 (1st Cir. 1981). If the Commissioner's decision is supported by substantial evidence, the court must defer to it; this is so even if alternative decisions are equally supported. <u>Rodriquez Pagan v. Secretary of Health and Human Services</u>, 819 F.2d 1, 3 (1st Cir. 1987). If, however, the Commissioner's decision was "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts," the court is not bound by those factual findings. <u>See</u> <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999). The ultimate determination of disability and conflicts in the evidence is for the ALJ, not the court. <u>Rodriquez</u>, 647 F.2d at 222; <u>Seavey</u>, 276 F.3d at 9.

II.    <u>Disability Determination</u>

The Social Security Act defines a disabled individual as one who is unable:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Additionally, the medical impairment must be so severe that the individual "is not only unable to do his previous work but, considering his age, education, and work experience, engage in any other kind of substantial work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Deblois v. Secretary of Health and Human Services, 686 F.2d 76, 79 (1st Cir. 1982).

The Social Security Act and its corresponding regulations[10] provide a five part test to determine whether a claimant is disabled under the statute.  Goodermote v. Secretary of Health and Human Services, 690 F.2d 5, 6-7 (1st Cir. 1982); 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4).  Under the first step, if the claimant is currently employed, he or she is automatically considered not disabled.  Id.  If the claimant is not working, the analysis proceeds to the second step.  Under the second step, the ALJ inquires whether the claimant has a severe impairment. Id.  A severe impairment meets the durational requirement, see 20 C.F.R. § 404.1509, and "significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, he or she is automatically considered not disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has a severe impairment, the analysis proceeds to the third step.  The third step asks whether

_____

[10]  20 C.F.R. § 404.1520(a)(4)(i)-(v) and 20 C.F.R. § 416.920(a)(4)(i)-(iv).

17

the claimant has "an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1." Goodermote, 690 F.2d at 6; 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant has such an impairment, the claimant is considered disabled per se. Id.

If the ALJ finds at the second step that the claimant has a severe impairment and also that the impairment does not equal one of the listed impairments mentioned in the third step, then the ALJ's analysis proceeds to the fourth step. 20 C.F.R. § 404.1520(e); Goodermote, 690 F.2d at 6. Under the fourth step, the ALJ considers whether the claimant has the RFC[11] to do his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The regulations define past relevant work as work that the claimant has done in the last 15 years. 20 C.F.R. § 404.1560(b)(1). The claimant is not disabled if he or she can do such past relevant work. Goodermote, 690 F.2d at 7. In the first four steps of the analysis, the claimant bears the burden of showing she is disabled. See Rohrberg v. Apfel, 26 F.Supp.2d 303, 306 (D.Mass. 1998).

If the claimant cannot do past relevant work, then the ALJ proceeds to the fifth and final step of the analysis, at which point the burden of proof shifts to the Commissioner. Id. at 306-07. Under the fifth step, the ALJ inquires whether the

---

[11]  As previously mentioned, RFC refers to "residual functional capacity."

claimant's RFC, age, education and work experience indicate that the claimant could work another job in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the Commissioner can show that the claimant is able to work another job, then the claimant is not disabled.

Applying the foregoing sequential analysis, the ALJ correctly found at the first step that plaintiff had not engaged in substantial gainful activity since May 1, 2009. (Tr. 41). At the second step, based on her consideration of the entire record, the ALJ correctly determined that plaintiff had severe medical impairments.[12] (Tr. 41-42). At the third step, the ALJ found that plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in the relevant regulations. (Tr. 42; 20 C.F.R. Part 404, Subpart P, Appendix 1).

At the fourth step, the ALJ found that plaintiff had the RFC to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: unskilled work with simple repetitive tasks, rare changes in the work setting, rare judgment or decision-making, no interaction with the general public, only occasional superficial interaction with co-workers and involving no crowds or elevators and limited fingering.

(Tr. 43). Also, the ALJ found that plaintiff has "moderate restriction in activities of daily living," moderate difficulties

---

[12]  See footnote two.

in social functioning, moderate difficulties "with regard to concentration, persistence or pace" and "one to two episodes of decompensation, each of extended duration."  (Tr. 46). Additionally, the ALJ found that plaintiff was unable to perform any past relevant work, which included work as a general clerk and personal care attendant. (Tr. 48).

At the fifth step, the ALJ considered plaintiff's RFC, age, education and work experience, along with the testimony of the vocational expert.  The ALJ found that plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (Tr. 49).  The ALJ thus concluded that plaintiff was not disabled under the Social Security Act.  (Tr. 49).

III.  Analysis

Plaintiff argues that the ALJ's decision is not supported by substantial evidence.  Specifically, plaintiff contends that the ALJ erred in disregarding the opinion of Dr. Jacobsohn.  (Docket Entry # 14).  Additionally, plaintiff contends that the ALJ failed to contact Dr. Pillard, the treating psychiatrist, to clarify whether he prepared an undated and illegibly signed Psychiatric Review Technique Form ("PRTF") in the record (Tr. 571-584) that concluded plaintiff was disabled per se.  The ALJ decided to reject the PRTF because it was undated and had an illegible signature, without investigating its source.  (Docket

Entry # 14; Tr. 42).  Plaintiff also asserts that the ALJ
committed reversible error by substituting her own judgment over
the SSA medical expert, Dr. Jacobsohn, simply because the ALJ did
not agree with his opinion.  (Docket Entry # 14).

A.    Disregarding Dr. Jacobsohn's Opinion

     Dr. Jacobsohn opined that plaintiff's impairments met the
criteria for Listing 12.04 and possibly the criteria for Listing
12.06.  (Tr. 42).  If plaintiff met the criteria for either
listing, she would be automatically disabled under step three.
See Burke v. Astrue, 2010 WL 4181145, at *5 (D.Mass. Aug. 6,
2010).  The ALJ rejected Dr. Jacobsohn's opinion and instead
determined that plaintiff's impairments did not meet or medically
equal Listings 12.04 and 12.06 singly or in combination.  (Tr.
43).  Because Dr. Jacobsohn testified that plaintiff met the
criteria for Listing 12.04 and only possibly met the criteria for
Listing 12.06, this court focuses on Listing 12.04.

     In order to satisfy Listing 12.04, the "required level of
severity . . . is met when the requirements in both A and B are
satisfied, or when the requirements in C are satisfied."  20
C.F.R. Part 404, Subpart P, Appendix 1, § 12.04.  The parties do
not dispute that plaintiff meets the requirements of paragraph
A.[13]  Therefore, to meet Listing 12.04 plaintiff also must
possess at least two of the four criteria under paragraph B:

---

[13]  See 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04A.

Marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04B.

With respect to activities of daily living, the ALJ determined that plaintiff had a moderate restriction in activities of daily living. (Tr. 42). The ALJ acknowledged plaintiff's testimony that she had difficulty with personal grooming and Dr. Jacobsohn's opinion that plaintiff had difficulty with activities of daily living. (Tr. 46). Then, the ALJ stated, "However, when necessary she was able to use public transportation and seek appropriate medical treatment." (Tr. 46). With respect to social functioning, the ALJ determined that plaintiff has moderate difficulties. (Tr. 42). The ALJ explained, "Although most of her behavior towards examiners had been appropriate and calm as well as described as cooperative, [plaintiff] reported socially isolating herself and avoiding crowds." (Tr. 46).

With respect to concentration, persistence or pace, the ALJ determined that plaintiff has moderate difficulties. (Tr. 42). The ALJ noted that plaintiff "would occasionally have difficulty maintaining attention and concentration needed to complete work tasks." (Tr. 46). Then, the ALJ wrote, "However, Dr. Senger stated that [plaintiff] scored 29/30 correct on the Mini-Mental

22

Status examination." (Tr. 46). Finally, with respect to repeated episodes of decompensation, the ALJ determined that plaintiff had experienced one to two episodes of decompensation,[14] each of extended duration because plaintiff had been hospitalized for psychiatric reasons. (Tr. 46).

The ALJ rejected Dr. Jacobsohn's opinion, asserting that he "based his opinion in large part on the claimant's exaggerated presentation at the hearing as opposed to simply the medical evidence of record, and failed to note that the claimant's presentation was very different when she was clean and sober and receiving medications." (Tr. 42-43). Plaintiff contends that the ALJ improperly rejected the opinion. The Commissioner contends that the ALJ's decision to reject the opinion was supported by substantial evidence.

Contrary to the ALJ's determination, Dr. Jacobsohn's opinion was grounded in the entire record of medical evidence. Specifically, plaintiff's attorney gave Dr. Jacobsohn a hypothetical, asking whether an individual with the OCD "tapping" that plaintiff described in her testimony would impact Dr. Jacobsohn's evaluation of her activities of daily living. (Tr. 93). In response, Dr. Jacobsohn testified, "Well, the moderate

_____

[14] The term "repeated episodes of decompensation," for the purposes of Listing 12.04, means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(4).

that I gave is based on the record.  I was impressed by the
information that she supplied today, which appears to be much
more dysfunctional than the record indicates."  (Tr. 93-94).  Dr.
Jacobsohn then testified that, assuming plaintiff's attorney's
hypothetical was true, he would instead have rated plaintiff's
activities of daily living as "more marked."  (Tr. 94).  This
testimony indicates that Dr. Jacobsohn evaluated plaintiff's
impairments on the basis of the record alone and did not base his
opinion on plaintiff's "exaggerated presentation" at the hearing.
Therefore, the ALJ's attempt to explain why she rejected Dr.
Jacobsohn's opinion falls short of being supported by substantial
evidence.

B.  Rejection of PRTF Without Verifying Its Origin

Plaintiff's second argument is that the ALJ erred by failing
to ascertain which physician authored the undated and illegibly
signed PRTF (Tr. 47, 571-584) that opined that plaintiff met
Listing 12.04 and possibly Listing 12.06 criteria.  (Docket Entry
# 14).  Instead of making a reasonable effort to identify the
source of the PRTF, the ALJ determined without further inquiry
that the opinion in the PRTF "is from an unacceptable medical
source and this assessment is inconsistent with the other
available medical records."  (Tr. 47).  Plaintiff contends that,
if the ALJ had investigated further pursuant to her duty to
develop the record, she would have determined that the PRTF

contained the opinion and the signature of Dr. Pillard, plaintiff's treating psychiatrist.  (Docket Entry # 14).

In the event of inconsistency or ambiguity in the record, the ALJ has a duty to seek information to develop the record.  20 C.F.R. §§ 404.1512(e) & 416.912(e).  The ALJ may fulfill this duty "by seeking additional evidence or clarification from the source, telephoning the medical provider, or requesting copies of the records, a new report, or more detailed report."  Gaeta v. Barnhart, 2009 WL 2487862, at *5 (D.Mass. Aug. 11, 2009); see also Giles v. Astrue, 2009 WL 2984049, at *7 (C.D.Cal. Sept. 17, 2009).  The court in Giles remanded the case due to the ALJ's failure to develop the record.  Specifically, the court found that "the fact that the treating physician's signature was illegible is not a legitimate basis upon which to reject the opinion.  Rather, the fact that the ALJ could not decipher the signature creates an ambiguity about which the ALJ should have inquired.  It is inexplicable that the ALJ did not make such a simple inquiry."  Id.  The court additionally found that remand was appropriate because "the identity of such physician could materially impact the weigh[t] to be given to such opinion."  Id. at *8.

Similarly, the court in Tracy remanded the case back to the ALJ due to his failure to attempt to ascertain the name of a physician whose signature on a document was illegible.  Tracy v.

<u>Astrue</u>, 518 F.Supp.2d 1291, 1300-01 (D.Kan. 2007). Specifically, the court held that "the development of an adequate record requires the ALJ to make a reasonable effort to ascertain the identity of a medical source who prepares a medical source statement which provides opinions regarding a claimant's physical and/or mental limitations." <u>Id.</u> Without making such a reasonable effort, the ALJ "could not ascertain whether this unnamed physician who filled out the medical source statement was a treating physician, a consultative physician, or a physician who merely reviewed the medical record but never saw the plaintiff." <u>Id.</u> at 1300. Without having that information, "it is impossible for the ALJ to determine the relative weight that should be accorded to this opinion." <u>Id.</u>

Similarly, in the case at bar, the record "does not indicate that the ALJ made any effort to ascertain the name of the medical source" and, despite that failure, "the ALJ nonetheless made a finding as to the weight to be accorded to the medical opinions contained in the medical source statement." <u>Id.</u> As the court held in <u>Tracy</u>, the ALJ in the case at bar should have made a reasonable effort to discover the origin of the PRTF by either inquiring "of agency officials or plaintiff's counsel as to [its] source." <u>Id.</u> at 1301. Alternatively, the ALJ could have compared the illegible signature with other signatures in the record to see if any were made by the same doctor. <u>Id.</u> Here,

the ALJ failed to develop the record by summarily dismissing the
PRTF as completed by an unacceptable medical source.  (Tr. 47).

　　Had the ALJ investigated the source of the PRTF and
considered its contents with the appropriate weight, the opinion
in the PRTF that plaintiff met a listing may have materially
impacted the decision in plaintiff's case.  See Scott v. Astrue,
2010 WL 2640531, at *9 (W.D.N.Y. Jun. 11, 2010) ("[h]ad [the ALJ]
not rejected [the physician's] RFC assessment due to an
inconsistent signature and considered the merits of her opinion,
it may have impacted his RFC assessment as [the physician's] RFC
contained greater limitations than those found by [the ALJ]").

　　It is important to note that, despite the duty to develop
the record, "reversal of the ALJ's decision for failure to
request additional information is warranted only where the ALJ's
failure is unfair or prejudicial to the claimant's case."  Gaeta,
2009 WL 2487862, at *6, n.4 (citing Shannon v. Chater, 54 F.3d
484, 488 (8th Cir. 1995)).  One can demonstrate such prejudice by
"'showing that additional evidence would have been produced if
the ALJ had fully developed the record, and that the additional
evidence might have led to a different decision.'"  Id. (quoting
Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000)).

　　In the case at bar, had the ALJ investigated the source of
the PRTF and found that Dr. Pillard, plaintiff's treating
physician, had signed it, that opinion stating that plaintiff met

Listing 12.04 and possibly Listing 12.06 may have been accorded
greater weight under 20 C.F.R. § 404.1527(d).  Additionally, it
would have been consistent with Dr. Jacobsohn's opinion that
plaintiff's impairments met the same criteria and the additional
evidence might therefore have led to a different decision.
Accordingly, the case at bar should be remanded for further
development as to the appropriate weight the ALJ should give to
the opinion in the PRTF.

C.  <u>Substitution of the ALJ's Opinion For Medical Opinions</u>

        Plaintiff also contends that the ALJ erred in substituting
her own opinion for medical opinions.  "It is common ground that
an ALJ is not free to substitute his own judgment for
uncontroverted medical opinion."  <u>Rose v. Shalala</u>, 34 F.3d 13, 18
(1st Cir. 1994).  "The ALJ must consider all medical findings
that support a treating physician's assessment that a claimant is
disabled, and can only reject a treating physician's opinion on
the basis of contradictory medical evidence, not on the ALJ's own
credibility judgments, speculation or lay opinion."  <u>Ambrosini v.
Astrue</u>, 727 F.Supp.2d 414, 425 (W.D.Pa. 2010).

        The court in <u>Ambrosini</u> remanded the case to the ALJ because
his decision was not supported by substantial evidence.  <u>Id.</u>
Specifically, the ALJ in <u>Ambrosini</u> did not fully accept the
opinion of a consultative psychological evaluator, who opined
that the claimant had marked difficulty in most work-related

mental activities, because it appeared to the ALJ that the physician's opinion was primarily based on the claimant's reports to the physician, which were inaccurate.  Id.  The ALJ also discounted another medical opinion, stating that it would only be accurate if the claimant was substance free.  Id.  Similarly, the ALJ in the case at bar rejected Dr. Jacobsohn's opinion because she believed it was based on plaintiff's "exaggerated presentation at the hearing as opposed to simply the medical evidence of record, and failed to note that [plaintiff's] presentation was very different when she was clean and sober and receiving medications."  (Tr. 43).

Furthermore, the medical record as a whole contains a number of consistent descriptions of plaintiff's presentation to various medical providers.  Plaintiff's treating physicians noted that plaintiff generally appeared anxious, depressed and trembling. The DDS consultative physician, Dr. Senger, likewise noted this presentation.  (Tr. 308-315, 426-456, 876, 881, 903).

Dr. Jacobsohn's testimony revealed his expert medical opinion that plaintiff met Listing 12.04 and he cited specific medical evidence in the record to support that opinion.  Dr. Jacobsohn testified that plaintiff consistently presented with tremors and, when the ALJ asked him whether plaintiff's presentation differed when she was clean and sober or not, his response was, "Not that I can see."  (Tr. 90).  Dr. Jacobsohn

also testified that although there were some actual changes in presentation, plaintiff generally presented as a dysfunctional person. (Tr. 92).

Also, because Dr. Jacobsohn testified by telephone conference call, he could not have reasonably observed what the ALJ described as plaintiff's "exaggerated presentation" at the hearing in forming his opinion. (Tr. 55). The ALJ's reasoning to reject Dr. Jacobsohn's opinion as to Listing 12.04 is not supported by substantial evidence and, in essence, the ALJ substituted her own opinion for the opinion of Dr. Jacobsohn.

Section 405(g) allows this court to reverse or modify the Commissioner's decision with or without remanding the cause to the SSA. Maguire v. Astrue, 2011 WL 3021790 (D.Mass. 2011). If an "essential factual issue has not been resolved," or "there is no clear entitlement to benefits," this court must remand the case to be reheard. See Seavey, 276 F.3d at 11. Here, there are a number of factual issues to be resolved. As previously indicated, a remand is therefore appropriate.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[15] plaintiff's motion to reverse or remand the decision

---

[15] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's

of the Commissioner (Docket Entry # 13) be **ALLOWED** and the Commissioner's motion to affirm the decision (Docket Entry # 15) be **DENIED** and that this case be remanded.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.